(No. 36207.

DEERFIELD PARK DISTRICT, Appellee, *vs.* PROGRESS DEVELOPMENT CORPORATION *et al.,* Appellants.

*Opinion filed April 26, 1961.—Rehearing denied June 13, 1961.*

John W. Hunt, W. Willard Wirtz, Newton N. Minow, Richard G. Kahn, and Howard Hoosin, all of Chicago, (Stevenson, Rifkind & Wirtz, of Chicago, of counsel,) for appellants.

Norman, Engelhardt & Zimmerman, of Chicago, and Snyder, Clarke, Dalziel, Holmquist & Johnson, of Waukegan, (Gerald C. Snyder, Lewis D. Clarke, Allyn J. Franke, of counsel) for appellee.

Mr. Justice Solfisburg delivered the opinion of the court:

This is an appeal from a judgment of the trial court in consolidated condemnation cases on June 28, 1960, ordering that title to certain real estate vest in the petitioner, the Deerfield Park District, (hereinafter called Park District), upon their depositing the sum of $168,500 with the county treasurer of Lake County. By this appeal, defendants, Progress Development Corporation and Chicago National Bank, as trustee, (hereinafter referred to jointly as Progress), seek to set aside the judgment and overrule the motion of the Park District to strike portions of defendants' traverse or motion to dismiss. No question is raised as to the amount of just compensation for the land taken which was stipulated in the trial court.

Stripped of the epithetical rhetoric of the parties the sole question before this court is the scope and extent of the issues which may properly be submitted to the trial court in a condemnation proceeding. However, a decision of this question necessitates a review of the proceedings

both in the trial court and Federal courts, together with the prior history of this controversy.

Beginning in April, 1959, and subsequent thereto, Progress acquired for residential development two unimproved tracts of real estate in the village of Deerfield, Lake County, Illinois. One tract of approximately fifteen acres became known as Floral Park Subdivision and the other tract of approximately seven acres, as Pear Tree Subdivision.

On July 8, 1959, the plat of Floral Park Subdivision was duly approved by the Deerfield village board. This plat was properly recorded on July 31, 1959, and provided for 39 residential lots. Thereafter, Progress commenced the installation of water, sewer and street improvements and the construction of two model homes with village board approval.

On September 16, 1959, the plat of Pear Tree Subdivision was approved by the Deerfield village board and was recorded on September 18, 1959. This plat provided for twelve home sites.

On December 7, 1959, the Deerfield Park Board took formal action to designate Floral Park and Pear Tree subdivisions as park sites and ordered that they be acquired by condemnation proceedings for park purposes. Plaintiffs rejected an offer of the Park Board to purchase these subdivisions for $166,199.91. In the same meeting the Park Board, by proper resolutions, provided for a referendum to be held on December 21, 1959, for the purpose of submitting to the voters of Deerfield a $550,000 bond issue, $175,000 of which was designated for the purchase of the two subdivisions owned by Progress. The remainder of the bond issue was to cover the acquisition of four other park sites of approximately 58 acres, making a total of approximately 80 acres in the six tracts.

On December 21, 1959, the bond issue referendum was held. The election carried, and the bond issue was approved by the voters.

The following day Progress, and their present corporation, Modern Community Developers, Inc., instituted suit in the United States District Court against the Park District, the village of Deerfield, and their respective boards, together with other individuals. The complaint alleged a conspiracy to deprive plaintiffs of their civil rights, and sought to enjoin the Park District from condemning the land; the village from unlawful enforcement of their building code; and further sought damages against all defendants. *Progress Development Corporation* v. *Mitchell,* 182 F. Supp. 681.

At the same time Progress and Modern sought a temporary restraining order from the United States District Court against the Park Board and the village trustees. The order was granted as to the village trustees but denied as to the Park Board. Two days later, on December 24, 1959, the Park District filed the present condemnation petition.

By agreement the condemnation proceedings were held in abeyance until hearings in the United States District Court were concluded.

On March 4, 1960, the United States District Court denied injunctive relief and dismissed the complaint of Progress and Modern and granted summary judgment thereon and they appealed.

Thereafter on March 11, 1960, Progress filed a motion to dismiss the condemnation petition on five grounds:

1. That a prior action is pending between the petitioner and one of the defendants in the United States District Court involving the same subject matter.

2. That the filing of the condemnation petition is an overt act in a conspiracy to deprive Progress of its civil rights.

3. That there is no *bona fide* public need for acquisition of this property for public use.

4. That petitioner did not negotiate or bargain in good faith.

5. That the acts of the petitioner in conspiracy with others are abuses of the power of eminent domain.

In support of the motion, Progress attached a copy of their complaint in the United States District Court. The same day the Park District moved to strike grounds 1, 2, and 5 of the motion to dismiss and filed an answer to grounds 3 and 4. The trial court granted the motion to strike grounds 1, 2 and 5 and, finding grounds 3 and 4 constituted a traverse of the petition to condemn, set the same for hearing.

Upon the hearing the Park District introduced evidence of its resolutions designating these areas as necessary park sites and authorizing their acquisition. They further proved offers to purchase and their refusal. Progress then submitted a 50-paragraph request for admission of facts which appears to have been treated below as an offer of proof. Objections thereto were sustained.

The gist of the rejected offer of proof is that Progress follows a policy of building homes for sale to Negroes and white persons; a policy first revealed to the general public on November 11, 1959. Prior to July, 1959, there were "For Sale" signs on the property; and the Park District did not contact the owner. The Park District and the local school board had many meetings with regard to school and park and swimming pool sites prior to November 11, 1959, but no discussion was had or acquisition attempted in relation to Floral Park or Pear Tree, until the public disclosure of the controlled occupancy policy of Progress.

Progress offered no further proof, and the parties stipulated as to the fair market value of the premises, and the order of condemnation was entered.

During the pendency of this appeal, the United States Court of Appeals for the Seventh Circuit, affirmed the orders of the district court denying plaintiffs' motion for a preliminary injunction; but reversed the orders and judgment dismissing the complaint and granting summary

judgment thereon. The cause was remanded for a trial on the merits. The court also denied a motion for mandatory injunctive relief. *Progress Development Corporation* v. *Mitchell,* Doc. 12976, January 4, 1961, (7th cir.) 286 Fed. 2d. 222.

On this appeal, Progress insists that they have been denied a right to a hearing in the trial court on their charges that the present condemnation proceeding is a part of a conspiracy to deprive Progress of their civil rights.

The Park District, however, maintains that the issues of conspiracy and a denial of civil rights can only be adjudicated in the forum of Progress's choice, the Federal courts; and that the Park District sufficiently proved below the necessity for condemnation.

It is conceded, as it must be, that every private owner of property holds his title subject to the lawful exercise of the sovereign power of eminent domain, and courts may not substitute their judgment for that of the condemning authority in inquiring into the necessity and propriety of the exercise of the power. *School Trustees* v. *Sherman Heights Corp.* 20 Ill.2d 357; *County Board of School Trustees* v. *Batchelder,* 7 Ill.2d 178.

Nevertheless the power of eminent domain, great as it is, is subject to constitutional limitations, and the courts may interpose their authority to prevent a clear abuse of the exercise of that right. *Department of Public Works and Buildings* v. *Lewis,* 411 Ill. 242; *City of Chicago* v. *Vaccarro,* 408 Ill. 587; *Tedens* v. *Sanitary District of Chicago,* 149 Ill. 87.

It is also well settled that State power cannot be used as an instrument to deprive any person of a right protected by the Federal constitution. *Gomillion* v. *Lightfoot,* 362 U.S. 916, 5 L. ed. 2d 110; *Shelley* v. *Kraemer,* 334 U.S. 1, 92 L. ed. 1161; *Aaron* v. *Cooper,* 358 U.S. 3, L. ed. 2d 1.

If, therefore, the Park District's attempted exercise of the power of eminent domain would deprive Progress of

equal protection of the law, it is the duty of the Illinois courts to prevent it. We do not think the resort of Progress to the Federal forum absolves the tribunals of this State from the duty of protecting their rights.

The present status of the Federal proceedings merely determines that Progress has failed to show sufficient ground for the issuance of a temporary Federal writ to stay the Illinois condemnation proceeding. There is at this time no final adjudication of the question of law regarding Progress's purported defense to condemnation.

The time was ripe to determine the validity of the defense in the trial court, and it was of necessity so determined by the judgment order.

The issues before us therefore narrow to two questions. (1) Did the stricken counts of the motion to dismiss contain allegations of fact which if proved would constitute a defense to the petition? (2) Did the offer of proof upon the traverse constitute a good defense?

We have carefully examined the motion to dismiss and the district court complaint which apparently is incorporated therein by reference. Viewed together they are replete with unsupported conclusions and voluminous allegations of fact which appear to be completely immaterial to any issue in this case. However, we think that the 42-page complaint contains allegations sufficient to charge the Park District with using its power of eminent domain for "the sole and exclusive purpose" of preventing the sale of homes by Progress to Negroes in violation of Progress's right to equal protection of the law.

We consider such a charge, if proved, to be a denial of the necessary prerequisites to condemnation of necessity and public use, and therefore a defense to the petition.

This conclusion, however, does not mean that all, or even a substantial part of the matters alleged by Progress are material to this inquiry. We think it of no importance that the citizens of Deerfield, and even a member of the

Park District board were opposed to the policy of controlled occupancy adopted by Progress. Nor is the fact that steps to acquire this land were not taken prior to Progress's announcement of its policies material here.

The material questions of fact are whether or not Deerfield needed park sites; whether or not Progress's property is suitable for park sites; and whether or not these sites will be devoted to public use. On these issues the Park District has made a *prima facie* case. *School Trustees* v. *Sherman Heights Corp.* 20 Ill.2d 357.

It then became incumbent upon Progress to rebut the *prima facie* case by material evidence. Progress, however, seems to argue that the facts which they have offered to prove would sufficiently rebut the Park District case. In this contention they rely on the recent case of *Gomillion* v. *Lightfoot,* 362 U.S. 916, 5 L. ed. 2d 110. As we have noted before, the teaching of that case is relevant here, but we think the facts are inapposite. The *Gomillion case* involved a suit for declaratory judgment by several Negroes claiming that Local Act 140 of the Alabama legislature was invalid on the ground that it deprived them of certain constitutional rights. Act 140 redefined the territorial limits of the city of Tuskegee, converting its shape from square to an "uncouth twenty-eight sided figure." All but four or five of approximately 400 qualified Negro voters were thereby excluded from the municipality while none of approximately 600 white voters were removed.

The United States Supreme Court, in striking down the redistricting, said:

"These allegations, if proven, would abundantly establish that Act 140 was not an ordinary geographic redistricting measure even within familiar abuses of gerrymandering. If these allegations upon a trial remained uncontradicted or unqualified, the conclusion would be irresistible, tantamount for all practical purposes to a mathematical demonstration, that the legislation is solely concerned with segre-

gating white and colored voters by fencing Negro citizens out of town so as to deprive them of their pre-existing municipal vote.

\* \* \*

"The complaint amply alleges a claim of racial discrimination. Against this claim the respondents have never suggested, either in their brief or in oral argument, any countervailing municipal function which Act 140 is designed to serve."

In the case at bar, the action protested—the condemnation of land for park purposes, is a legitimate and laudable municipal function. The designation of Progress's land as a park site and its acquisition, standing alone, contains no such irresistible mathematical demonstration of illegal purpose as contained in the Alabama legislation.

In *Gomillion,* the United States Supreme Court did not engage in any metaphysical investigation into the motives of the legislators. They found the inescapable illegal purpose from the act itself. From an examination of the record in the case at bar, it is apparent that many of the allegations of Progress are framed for the purpose of directing a judicial inquiry into the motives of the individual members of the Park District Board, rather than into the actual purpose for which this land is sought. This is clearly an inappropriate area for judicial inquiry. (*Detroit United Railway* v. *City of Detroit,* 255 U.S. 171, 178, 65 L. ed. 570; *Soon Hing* v. *Crowley,* 113 U.S. 703, 710-711, 28 L. ed. 1145; *Sinclair Refining Co.* v. *City of Chicago,* (7th cir.) 178 F.2d 214, 217.) As we stated in *Ligare* v. *City of Chicago,* 139 Ill. 46, in a condemnation case the purpose for which the power of eminent domain is exercised may be questioned, but "the motives that may have actuated those in authority are not the subject of judicial investigation."

We cannot see how the rule could be otherwise. If parks are needed in Deerfield, and if the land so selected for them is appropriate for that purpose, the power of eminent do-

main cannot be made to depend upon the peculiar social, racial, religious or political predilections of either the condemning authority or the affected property owner. Progress is entitled to the same opportunity to hold land and operate a business as anyone else. They, like all others, hold their land subject to the lawful exercise of the power of eminent domain. They like all others are entitled to show, in a condemnation proceeding, that the land sought to be taken, is sought not for a necessary public purpose, but rather for the sole purpose of preventing Progress from conducting a lawful business. *Cf. Progress Development Corporation* v. *Mitchell,* (7th cir.) Doc. 12976, folio 19, 286 F.2d 222.

In the light of these observations, we must consider the record below. We think that any proper proof on the issue of the right of condemnation could have been presented on the pleadings before the trial court on the hearing on the traverse. If by the trial court's ruling, it was intended to strike the allegation and deprive Progress of the right to prove by material facts that the exercise of eminent domain in the instant case was not necessary, and was not to be devoted to a public use, but was for the sole purpose of depriving Progress of the right to do business, then the ruling was in error. We have carefully examined the record, and while we feel that Progress's offer of proof was in poor form, and to large degree immaterial, the colloquy in the trial court, and the briefs and argument before us indicate a restriction on the right of Progress to prove a lack of necessity and public purpose. From the record as a whole we feel that justice will be served in reversing the judgment of the trial court and remanding the cause for the sole purpose of permitting Progress a full hearing on the question of whether this taking is necessary and for a public purpose.

*Reversed and remanded, with directions.*