## TAYLOR *v.* TOWNSHIP OF DEARBORN.

1. MUNICIPAL CORPORATIONS—RACIAL DISCRIMINATION—POLITICAL RIGHTS—COURTS.

   The courts of this State are ever open for the hearing of any citizen who claims interference with his political rights on the ground of racial discrimination because of the location of city boundaries so as to deprive citizens of their pre-existing municipal vote.

2. SAME—INJUNCTION—INCORPORATION OF CITY.

   Findings of trial court in suit to enjoin further proceedings toward incorporation of a new home-rule city from hitherto unincorporated portions of township territory to the north and south of incorporated village and joined by a corridor 3 blocks wide which included 1 through street in easterly edge of village, which was not so arranged as to racially discriminate against anyone remaining in the village, and was not gerrymandering, *held,* supported by evidence and to have justified dismissal of the bill (US Const, art 6).

3. COSTS—INCORPORATION OF NEW CITY—INJUNCTION.

   No costs are allowed on appeal in suit to enjoin further proceedings toward incorporation of new home-rule city, where relief sought is presently denied.

4. MUNICIPAL CORPORATIONS — INCORPORATION OF NEW CITY — INJUNCTION.

   No right or penalty may accrue in favor of defendant township, new city officers or county officers on account of execution and filing of stay bond hitherto ordered in suit to enjoin further proceedings toward incorporation of new home-rule city from township and village territory (US Const, Ams 14, 16).

   Per CARR, C. J., and DETHMERS, KELLY, BLACK, and KAVANAGH, JJ.

REFERENCES FOR POINTS IN HEADNOTES

[1] 18 Am Jur, Elections § 13 *et seq.*
[2, 5] 18 Am Jur, Elections § 13 *et seq.*
   37 Am Jur, Municipal Corporations § 7 *et seq.*
[3] 14 Am Jur, Costs §§ 10, 14, 22.
[4] 28 Am Jur, Injunctions § 342.
   8 Am Jur, Bonds §§ 85–90.

5. Same—Judgment—Continuing Jurisdiction—Racial Discrimi-
    nation.
    Adjudication is made that proceedings to incorporate new home-
        rule city from township territory on north and south of in-
        corporated village connected by corridor 3 blocks wide along
        easterly side of the village and from its territory are valid as
        against claim in class suit that constitutional rights are in-
        fringed, but jurisdiction is retained to permit future petitions
        seeking specific relief against new city from future action
        resulting in racial discrimination (US Const, Ams 14, 15).

Per Black, Kavanagh, Souris, and Smith, JJ.

Appeal from Wayne; Holbrook (Donald E.), J., presiding. Submitted December 4, 1962. (Calendar No. 124, Docket No. 50,020.) Decided April 5, 1963.

Bill by Thomasina Taylor, Lloyd Holt, Lillie Ammons, and Aaron Neal, taxpayers and registered voters as representatives of a class, against the Township of Dearborn, a public corporation, the Village of Inkster, a home-rule village, the Charter Commission of the proposed City of Dearborn Heights, the Wayne County Board of Supervisors, and various other bodies and public officials, to declare illegal and void the incorporation of the proposed city of Dearborn Heights and the incorporation therein of a portion of the village of Inkster, and to enjoin further proceedings in respect thereto. Bill dismissed. Plaintiffs appeal. Affirmed and cause remanded for retention of jurisdiction.

*Rothe, Marston, Mazey, Sachs & O'Connell,* and *Edward M. Turner (Theodore Sachs,* of counsel), for plaintiffs.

*Richard D. Dunn (Stanley E. Beattie,* of counsel), for defendants Township of Dearborn, Charter Commission of the proposed City of Dearborn Heights, and various individual public officials.

*Albert H. Schlenker, Jr.,* for Village of Inkster, asking reversal.

BLACK, J.  This case was conceived of *Gomillion* v. *Lightfoot,* 364 US 339 (81 S Ct 125, 5 L ed 2d 110), decided November 14, 1960.  Prior to submission (October 18, 19, 1960) of *Gomillion* our own case of *Village of Inkster* v. *Wayne County Supervisors,* 363 Mich 165, was submitted for decision. The *Inkster Case* determined over objection of the village that the proceedings to incorporate Wayne county's new city of Dearborn Heights were statutorily valid.  Now the village joins these class-acting plaintiffs in assailing the same proceedings as violative of rights protected by the Fourteenth and Fifteenth Amendments.  All plaintiffs rely upon the *Gomillion Case* and its ban against the singling out by State action of readily isolated segments of racial minorities for discriminatory treatment.

Plaintiffs' bill was filed shortly after handing down of the mentioned *Inkster* decision.  It gathers its whole thrust and force in complete paragraph 21:

"21.  Plaintiffs allege that the inclusion in the proposed city of Dearborn Heights of all of the township of Dearborn, excepting only that portion of the township lying within the village of Inkster bounded on the west by Inkster road and on the east by Beech-Daly road, was made to effect and does effect a separation of persons on account of race, and an all-white proposed city of Dearborn Heights."

The trial chancellor, following an extended testimonial hearing of the merits, concluded that plaintiffs had failed to sustain the foregoing allegation and found that the legal need for contiguity of an incorporated city was the controlling reason for inclusion, by the statutory petitioners and the electors, of the rectangular "corridor" (see map, 363 Mich at 167) as a part of the new city of Dearborn Heights.  He found further, and accordingly ruled, that the incorporation of such new city violated no right asserted by plaintiffs.

*Bray* v. *Stewart,* 239 Mich 340, upheld statutory validity of the proceedings by which Inkster village was incorporated. That was in 1927, following incorporation of the present city of Dearborn. The incorporation of Dearborn city and of Inkster village—the city east and the village west of Gulley road (see map)—changed the legal status of great portions of Dearborn township. The unincorporated remainder of the township was left in 2 separated segments, 1 north and 1 south of Dearborn and Inkster. However, the incorporation of the village differed from that of Dearborn city in that the village territory remained a part of the township.[1] It is this combined village-township status, of residence and franchise, which plaintiffs seek to preserve as against city incorporation of the 2 segments with the "corridor"; the corridor by which the segments were statutorily joined.

By delicate overture the controversy should be stripped of all digressive and impertinently heated veneer lest the Court enter—unnecessarily this time —another thorny and trackless bramblebush of politics. Here are the standout specifics of the case, with respect to which there can be little if any serious disagreement:

*First:* If the separated segments were to be incorporated at all, *as one city,* it was legally, practically and politically necessary that the incorporating petitioners and electors include within the corporate limits some portion of Inkster village. Why necessary? Because the common law definitely requires contiguity of the territory of a city[2] and definitely

---

[1] "The territory taken into the village when incorporated is in no way separated from the township. It still remains a part thereof, is subject to taxation therein, and its residents are electors thereof." *Bray* v. *Stewart* at 344.

[2] See 37 Am Jur, Municipal Corporations, § 27, pp 644, 645; followed on this point in *Township of Genesee* v. *Genesee County,* 369 Mich 592.

permits (as held in the cited *Inkster Case*) incorporation of a new city partly from unincorporated territory and partly from incorporated village territory. And previous voting experiences shown in the record, all dismal of result, suggested that in all probability city status of the segments was politically attainable only by the means shown in the cited *Inkster Case.*

*Second:* The petitioners and electors chose to proceed as thus permitted, taking into the new city the narrowest and most feasible part of the village, the better as their proofs suggest and the trial chancellor found to leave the whole village (including its comparably greater area of exclusive white residence)[3] substantially intact.

*Third:* There is no suggestion that the "impenetrable wall," of which plaintiffs complain, exists with respect to the southerly boundary of the north segment which adjoins the village, or the north boundary of the south segment which borders the village on the south. Further, plaintiffs do not object to incorporation, separately as 2 distinct cities, of the north and south segments. The taking of the corridor thus becomes the real target of their charge. In such connection it is significant that there is no area of Negro residence at all east or west of that part of the corridor which is north of Michigan avenue.

The present issue cannot be one of motive on the part of the incorporators of and campaigners for the new city. Such an issue is not currently justiciable. See *Detroit United Railway* v. *City of Detroit,* 255 US 171 (41 S Ct 285, 65 L ed 570) ; *Deerfield Park District* v. *Progress Development Corp.,* 22 Ill 2d 132 (174 NE2d 850) on motion to dismiss ; 26 Ill 2d

---

[3] We refer here to the whole northerly half (plus) of the village. Exhibit 2 shows it as exclusively white.

296 (186 NE2d 360) on review of tried issue; cert den 372 US 968 (83 S Ct 1093, 10 L ed 2d 131).[4]  The motives of such incorporators and campaigners are important only as a possible link with racially discriminatory events which may, but as yet have not, occurred within the new city by action of or with tacit consent of the city fathers.  This is not to suggest that plaintiffs have proved the invidious motive they allege.  It is to say only that the issue is not as yet before us.

The real question is whether the electors (see tabulation of vote by areas, 363 Mich at 172) brought about a result which became and now is a violation of the rights of plaintiffs under the Fourteenth and Fifteenth Amendments.  The answer depends in part on the persuasiveness of what is offered as proof supporting quoted paragraph 21 of the bill, and partly upon validity of plaintiffs' contention that their combined right of franchise (that of resident electors of the incorporated and unincorporated parts of Dearborn township as same stood prior to the incorporating vote of June 20, 1960) was and is a status the courts of Michigan must maintain by force of *Gomillion's* rule.

Turning now to the descriptive and largely undisputed facts.  Exhibit 2 is a large map of the entire area of Inkster village and of the incorporated new city.  It portrays with care and specificity the areas and locations of Negro and white residence in Inkster village and in the incorporated new city, all taken from the 1960 census.  The situation thus portrayed may be summarized as follows:

(a) The village and new city consist almost entirely of areas of white residence excepting only as

---

[4] In *Deerfield* it was charged that the park district used its power of eminent domain "for the sole and exclusive purpose of preventing the sale of homes by Progress to Negroes."  The charge failed for want of proof.

to the southerly portion of the village, referring to that part which lies south of Michigan avenue and west of Inkster's Bayhan street. Bayhan parallels the west line of the corridor and is distant some 1,750 feet westerly therefrom. East of Bayhan and west of the corridor are a few sporadic homes of Negro residence. These are all south of Yale avenue, which in turn is about 1,750 feet south of Michigan avenue. In the new city proper, but 2 small places are designated "Non-Negro, Non-White." The rest of the city is all white, excepting only that undisputed testimony shows that 9 Negroes reside in the north segment.

(b) The heaviest areas of Negro residence are in the southwest quadrant of the village, and in the westerly half of the southeast quadrant thereof west of Bayhan. They are separated from the corridor by what may be termed another parallel corridor. Michigan avenue and Bayhan being the north and west boundaries thereof and Beech-Daly being the east boundary. The corporate status of this last corridor was unchanged by the new incorporation.

Looking with care at exhibit 2, it is manifest that the petitioners for incorporation are criticized by plaintiffs for *not* having done what purposeful segregators would have prepared for elective approval, that is, a petition for incorporation which—in addition to the areas that were incorporated—would have taken in *all* of the huge areas of white residence of Inkster lying north of Michigan avenue. It is equally manifest that the petitioners for incorporation undertook to take into the new city as little as possible of the village. Thus they are damned for taking too little when in all probability they would have been denounced for taking too much.

In connection with the conclusions thus drawn the trial chancellor's question to plaintiffs' counsel and the latter's reply disclose with significance that plain-

tiffs' real contention is that the west boundary of the corridor could not have been designated anywhere with their approval. The chancellor inquired, and plaintiffs' counsel replied:

*"The Court:* Isn't it your contention, Mr. Sachs, that they should have included all of the village of Inkster in the township in this new incorporation?

*Mr. Sachs:* It is my suggestion, your Honor, that they could have drawn the line in any of several places. It's not appropriately my function, I respectfully say to the court, to tell them where the line is to be drawn."

The same question brought the same reply during oral argument here. Thus this Court of equity is left in the dark with respect to what the plaintiffs want, beyond of course a decree holding that Dearborn Heights was incorporated in violation of plaintiffs' federally-asserted rights, and so we come to consideration of the *Gomillion Case* and plaintiffs' contention that the facts here call for application of its rule.

In *Gomillion,* unlike the testimonially complete case before us, the supreme court was obliged to accept as true all conclusions of fact the complaining Negro citizens had properly pleaded. In that case, unlike this case again, the pleaded status of the complaining citizens was that of original resident voters of an existent city (Tuskegee) ; a status Alabama allegedly sought to destroy by legislation which if valid fenced such resident voters out of the city— in the absence of "any countervailing municipal function" to be served thereby—by means of monstrously drawn boundaries of apparently effective segregation (see chart, 364 US at 348). Here there is a countervailing municipal function to be served. It was found below and consists of the legal requirement of contiguity and of the practicality of joining the 2 unincorporated segments by a corridor

only of the village; a corridor providing convenient (for all) water and sewer connections and the only nearby straight-through public way (Beech-Daly) as west boundary thereof.

This is not to suggest that the defendants needed to show such countervail, since there is nothing beyond predictive testimony which tends reasonably to prove that the incorporation of Dearborn Heights could or will fence anyone out. It may be, in Alabama, that the establishment of new and exaltedly exclusive city limit lines can or does effectively fence out those who, by the standards of an elite or self-anointed peerage, constitute some mass or masses of undesirables or, possibly, belong to the class of the great unwashed who work manually and sweat daily for the living they make. But that is not true in Michigan, at least so far as present proof or judicial notice brings to view, and this Court may not just haul off and imagine that the incorporation of any new city in southeastern Michigan is going to fence any racially identifiable group therefrom just because that group happens to reside in another long standing incorporated area which is near 1 of the new lines of municipal limits.

The real fact of *Gomillion* is that the righteously complaining citizens were once inside the old and established city of Tuskegee; and that Alabama sought to subdivide that same city, by a demonstrable gerrymander, so that specific areas of Negro residence in the city would be separated from other areas of residence by an irregularly shaped new city. Here it is shown that the complainants are left to reside and vote as before, that is, in their original village and township. The only change is that the village is now reduced in size by the taking of the corridor only, and the township is reduced in size by the taking of the unincorporated remainder of such township. This leaves intact to plaintiffs the

actual village of their residence, the negligible corridor only excepted. Too, it leaves to them their right to vote in future village and township elections.

Whatever the fact in Alabama, the courts of this State are ever open for the hearing of any citizen who on account of provable racial discrimination says he cannot cross or recross at will, or reside and vote as a resident on either side of, or cannot buy or rent property on the other side of, an "impenetrable wall" made of a city limit or boundary. But up to the present time, for want of proof, plaintiffs' fears in such regard must be held as doubtfully anticipatory and justiciably premature. As said in *Warren Township School District, No 7* v. *Detroit*, 308 Mich 460, 479 (1 CCH Av 1162, 1944 US Av R 35), "We must consider conditions as they are now and do not indulge in speculations as to the future." Further, and to paraphrase the Court's conclusionary remarks in *Brown* v. *Shelby Township*, 360 Mich 299, 310, on the present record it may not be said with any degree of assurance that the incorporation of Dearborn Heights will erect or permit a racial "wall." If any such "wall" should come to equity's attention, that will be the time and occasion for action by equity. Of such point, more later.

The fact is that every new city incorporation requires—in Michigan at least—the drawing of municipal boundary lines for elective approval. Most of legal necessity "fence out" some citizens, principally white and occasionally Negro. But they cannot be attacked under *Gomillion's* rule unless by pleading and due proof it is shown that the substantial result is the segregation of Negroes and whites "so as to deprive them [Negroes] of their pre-existing municipal vote." (*Gomillion* at 341.) There is no such segregation here in fact, and none so far is threatened in fact distinguished from mere apprehension.

No right of constitutional substance has been taken thus far from anyone, no matter the color of his skin.

## SUMMARY

The conclusion one is forced to draw from plaintiffs' present position is that they stand opposed to any change of the corporate status of Inkster village, fearing that such change will lead to that which was pleaded in the *Gomillion Case.* The contention goes too far and proves too much. To approve it by decree would vest with the same plaintiffs the right to object successfully to the abeyance-held proceedings (enjoined at behest of plaintiffs upon institution of this suit) which were petitioned for and designed toward incorporation as a city of Inkster village. Indeed, such a decree could at option of the plaintiff class stand permanently in the way of all proceedings which, *inter alia,* might at some future time be designed to incorporate all northwest Wayne county into a great new city, or several new cities.

The trial chancellor found "that the present strip area at the extreme easterly edge of the village of Inkster and proceeding westerly to Beech-Daly road, 3 blocks, being the first uninterrupted right-of-way completely from north to the south parts of the township, was the simplest and a practical defined area for effecting contiguity in order to connect the north and south parts of the unincorporated township of Dearborn into a new home-rule city." He found further that this "was not gerrymandering, but was prompted by a motive that was legitimate and not promoted for the purpose of discriminating against anyone in the village of Inkster." Such findings are fully supported. They with auxiliary findings recorded below call for affirmance of the decree

of dismissal, subject however to that which is to follow.

. . . . .

To affirm the trial chancellor's decree does not fully conclude equity's task. This case is an exceptional forerunner—in our State—of possible problems which, advanced as they have been upon combined strength of the Fourteenth and Fifteenth Amendments, press already on the courts of some of the States as well as the courts of the United States.[5] All courts of this country, the Sixth Article considered, are affirmatively bound to guard "every right secured by the Constitution and laws of the United States whenever those rights are involved in any suit or proceedings before them." (*United States* v. *Bank of New York & Trust Co.*, 296 US 463, 479 (56 S Ct 343, 80 L ed 331); following *Robb* v. *Connolly*, 111 US 624 [4 S Ct 544, 28 L ed 542]). Noticing judicially, as we do, the probable approach to appellate courts of the Atlanta decision, the recent executive order of the president and like efforts of lay and religious groups to promote racially "open" housing, and reflecting upon our own duty quoted above, we have determined to do more than was done in the *Warren Township Case* (*supra* at 479), where the Court affirmed "without prejudice" to a possible new suit disclosing that the plaintiffs' predictions had become veritable.

Our judgment is that jurisdiction to entertain and determine supplementary proceedings should be retained. By such retention an already well informed

---

[5] The recent and nationally reported litigation which arose in Georgia, after the aldermen of Atlanta had ordered the barricading of a street to separate white and Negro residential areas, is an example of what seems to be ahead for some of our State and Federal appellate courts. It suggests that we decide now only what is in need of specific decision, with retention of jurisdiction to consider impending precedents as well as developments after Dearborn Heights has undergone cityhood for such period as may calm or support plaintiff's fears.

trial chancellor may, subject to supervision of this Court as requested or needed, proceed to ensure that what is affirmed today will not become a means or the means by which plaintiffs' asserted constitutional rights are adversely affected. It is accordingly adjudged:

1. That the proceedings by which Dearborn Heights became incorporated as a city are valid as against plaintiffs' contention that such proceedings have infringed and will infringe upon their asserted constitutional rights.

2. That the cause be remanded with instruction that an order enter retaining the case on the docket of the circuit court, until further order of this Court, for the purpose of entertaining and determining below any future petition or petitions plaintiffs or any member of the class represented by them may wish to present, the design of which petition or petitions is that of seeking specific relief as against the new city, its officers, agents, employees, and representatives, from future action or conduct within the control of the city which results in racial discrimination inimical to and hence actionable under either or both the aforesaid amendments. In event the nature and scope of relief, if any, to be granted with respect to such petition or petitions is obscure or doubtful, the trial chancellor may apply to this Court for appropriate instructions.[6]

3. That no costs be awarded to any party in virtue of the present appeal, and that no right or penalty

---

[6] The trial chancellor will bear in mind, as we do, Justice Cardozo's enduring epigraph, "equity will find a way" (*Graf* v. *Hope Building Corp.*, 254 NY 1 [171 NE 884; 70 ALR 984], quoted in *Spoon-Shacket Company, Inc.*, v. *Oakland County*, 356 Mich 151, 165), and our approval (*Certain-teed Products Corp.* v. *Paris Township*, 351 Mich 434, 468) of Judge Frank's reminder that courts may regularly utilize "the inestimably valuable flexibility and capacity for growth and adaption to newly emerging problems which the principles of equity have supplied in our legal system."

accrue in favor of defendants on account of execution and filing of the stay bond hitherto ordered.

KAVANAGH, J., concurred with BLACK, J.

KELLY, J. (*concurring in part*). Plaintiff's appeal to this Court asking that we "restrain the incorporation of the proposed city of Dearborn Heights, Wayne county, Michigan, for the reason that the creation of such proposed city involves a racial gerrymander designed to exclude Negro citizens, all in contravention of the Fourteenth and Fifteenth Amendments to the United States Constitution."

In a well prepared opinion reviewing the record, Justice BLACK has definitely and clearly expressed this Court's answer to plaintiffs' claim of a designed "racial gerrymander" as disclosed by the following:

"Here it is shown that the complainants are left to reside and vote as before, that is, in their original village and township. The only change is that the village is now reduced in size by the taking of the corridor only, and the township is reduced in size by the taking of the unincorporated remainder of such township. This leaves intact to plaintiffs the actual village of their residence, the negligible corridor only excepted. Too, it leaves to them their right to vote in future village and township elections.

"Whatever the fact in Alabama, the courts of this State are ever open for the hearing of any citizen who on account of provable racial discrimination says he cannot cross or recross at will, or reside and vote as a resident on either side of, or cannot buy or rent property on the other side of, an 'impenetrable wall' made of a city limit or boundary. But up to the present time, for want of proof, plaintiffs' fears in such regard must be held as doubtfully anticipatory and justiciably premature. * * *

"On the present record it may not be said with any degree of assurance that the incorporation of

Dearborn Heights will erect or permit a racial 'wall.' If any such 'wall' should come to equity's attention, that will be the time and occasion for action by equity. * * *

"There is no such segregation here in fact, and none so far is threatened in fact distinguished from mere apprehension. No right of constitutional substance has been taken thus far from anyone, no matter the color of his skin. * * *

"The trial chancellor found 'that the present strip area at the extreme easterly edge of the village of Inkster and proceeding westerly to Beech-Daly road, 3 blocks, being the first uninterrupted right-of-way completely from north to the south parts of the township was the simplest and a practical defined area for effecting contiguity in order to connect the north and south parts of the unincorporated township of Dearborn into a new home-rule city.' He found further that this 'was not gerrymandering, but was prompted by a motive that was legitimate and not prompted for the purpose of discriminating against anyone in the village of Inkster.' Such findings are fully supported."

The issue submitted has been decided. After laying at rest the accusations of gerrymandering and improper motives, I see no reason why we should be "justiciably premature" and judge the future with apprehension, or prepare for "possible problems."

I do not agree with my Brother that "the cause be remanded with instruction that an order enter retaining the case on the docket of the circuit court, until further order of this Court."

I vote to affirm the lower court's decree, and adopt Justice BLACK's decision in re costs and penalties.

CARR, C. J., and DETHMERS, J., concurred with KELLY, J.

Souris, J. (*concurring in affirmance and remand*).
I concur in Mr. Justice Black's disposition of this
appeal. Plaintiffs' proofs failed to establish either
present deprivation of due process or equal protec-
tion of the laws guaranteed by the Fourteenth
Amendment or present denial or abridgement on
account of race, color, or previous condition of servi-
tude of their right to vote as guaranteed by the
Fifteenth Amendment.

1. Inkster village straddles the boundary between
Nankin and Dearborn townships. In that part of the
village lying in Dearborn township, there are (1960
census data) 18,700 residents of whom 4,600 are
Negro. Within the so-called strip area of Inkster
included within the boundaries of the proposed city
of Dearborn Heights reside 2,980 persons,* none of
them Negro. Of the remaining 15,720 persons who
reside in the Dearborn township portion of Inkster
village, 11,120 whites and 4,600 Negroes are excluded
from the new city. Whatever the incorporators'
motives or purposes in drawing the new city's bound-
aries as they did, the results affected all remaining
residents of the Dearborn township portion of Ink-
ster village, both white and Negro, in precisely the
same manner. If those who are Negro were excluded
from the new city, so were the white residents. If
the Negro residents were deprived of portions of
their incorporated village and of their township, so
were the more numerous white residents. If, by
the contraction of the boundaries of the village and
township resulting from incorporation of the new
city, the Negro residents' right to vote was affected,
so was the right to vote of each remaining white resi-
dent. The point is that Inkster's Negro residents
were not affected in any manner different from the
more numerous white residents who were not in-

---

* Computed from plaintiffs' Exhibit 3.

cluded in the new city. Their present exclusion from the new city was not discriminatory in the sense that only Negroes, but not whites, were excluded therefrom; nor, as Justice BLACK properly concludes, does this record show that by racially discriminatory action of defendants any citizen "cannot cross or recross at will, or reside and vote as a resident on either side of, or cannot buy or rent property on the other side of, an 'impenetrable wall' made of a city limit or boundary." From such facts there can be no judicial finding that defendants, whatever their motives, violated plaintiffs' Fourteenth or Fifteenth Amendment rights.

2. *Gomillion* v. *Lightfoot,* 364 US 339 (81 S Ct 125, 5 L ed 2d 110), was relied upon by plaintiffs in support of their Fifteenth Amendment claim. As I read Justice BLACK's opinion, he suggests that *Gomillion's* rule is inapplicable except when municipal boundaries are so drawn that Negroes are excluded from, and denied the right to vote in, the municipality in which they previously lived and voted. I agree that *Gomillion* is inapplicable, but only because plaintiffs' proofs failed to show that the suffrage rights of only, or substantially only, Negroes were affected. In fact, plaintiffs' proofs, as indicated above, show clearly that whatever present effect incorporation of the new city had on the rights of Inkster's Negroes, it affected likewise the rights of all white residents and voters remaining in the village of Inkster.

I cannot believe that the decision in *Gomillion* would be other than as we know it, as Justice BLACK seems to suggest, had Alabama's legislature created by statute a lily-white 28-sided monstrosity of a new city entirely within, and without alteration of, the pre-existing boundaries of racially impure Tuskegee. Fifteenth Amendment rights do not depend upon the formalistic distinction between fencing

Negroes out of their municipality and fencing them in. *Gomillion's* assertion of Fifteenth Amendment rights would be entitled to equal judicial regard had Alabama's legislature left Tuskegee's Negroes the heritage of their old municipal community, including its legislative charter and pre-ordained name, save only a withdrawn portion inhabited exclusively by whites.

I see no valid distinction between *Gomillion's* rule and these plaintiffs' *pleaded* constitutional claim. Had they *proved* that Negroes' rights to vote had been abridged discriminatorily by the contraction of the village and township in which they lived and voted, they would be entitled to judicial vindication of their constitutional rights.

3. That there is racial segregation in housing in the village of Inkster cannot be denied. Justice BLACK's description of its racial composition portrays the brutal facts. Its existence, however, is not the result of the new city's incorporation nor does the record disclose that the incorporation of that new city presently discriminatorily denies or abridges Inkster's Negro residents' rights, as Justice BLACK has noted.

However, this record discloses sufficient evidence to convince me, reviewing this record *de novo,* that certain of the defendants and others associated with their incorporation efforts were not entirely free of racial bias in the performance of acts necessary to the new city's incorporation. That such evidence does not rise to the level of immutable truth is no deterrent to the exercise by this Court and by the chancellor of continuing jurisdiction, as Justice BLACK proposes, to guard every right secured to plaintiffs by the Constitution and laws of the United States and of this State.

We deal here with constitutional rights dependent for their universal enjoyment upon our judicial will

and skill to guard against sophisticated as well as unsophisticated restraints. By retaining jurisdiction this Court, through the chancellor, can deter rapidly and effectively any future infringement of plaintiffs' rights which existing patterns of racial segregation might otherwise encourage.

SMITH, J., concurred with SOURIS, J.

O'HARA, J., took no part in the decision of this case.