STRAUS v GOVERNOR

Docket No. 112401. Argued November 9, 1998 (Calendar No. 2). Decided
    April 27, 1999.

Kathleen N. Straus and three other members of the State Board of
    Education brought an action in the Ingham Circuit Court, challeng-
    ing the constitutionality of Executive Orders 1996-11 and 1996-12,
    which restructured the Department of Education. The plaintiffs
    claimed that the transfer of powers from the State Board of Educa-
    tion to the Superintendent of Public Instruction violated Const
    1963, art 8, § 3, and that the restructuring of the Department of
    Education infringed the board's constitutional responsibility to pro-
    vide leadership and general supervision over public education. The
    court, Carolyn Stell, J., granted a declaratory judgment and issued
    a permanent injunction for the plaintiffs. The Court of Appeals,
    O'CONNELL and WHITBECK, JJ. (FITZGERALD, P.J., concurring in part and
    dissenting in part), reversed, finding that the executive orders were
    a legitimate exercise of the Governor's constitutional authority to
    reorganize the executive branch and that the orders did not intrude
    on the board's constitutional duties.    230 Mich App 222 (1998)
    (Docket No. 204457). The plaintiffs appeal.

    In an opinion per curiam, signed by Chief Justice WEAVER, and
    Justices BRICKLEY, TAYLOR, CORRIGAN, and YOUNG, the Supreme Court
    held:

    Neither Executive Order No. 1996-11 nor Executive Order No.
    1996-12 facially infringes any constitutional powers or prerogatives
    of the State Board of Education under Const 1963, art 8, § 3. The
    Governor, having protected the board's ultimate authority over the
    state's educational system, has made no improper transfer of its
    powers or responsibilities. Further, the executive orders at issue
    are within the scope of the Governor's authority under Const 1963,
    art 5, § 2.

    1. Executive Orders Nos. 1996-11 and 1996-12 transfer various
    powers of the State Board of Education to the Superintendent of
    Public Instruction. While the plaintiff board members, voting as a
    bloc, have the ability to either determine the result of any matter
    coming before the board or to create an impasse if all other mem-
    bers of the board seek an opposite outcome, the Executive Orders

limit this ability by allowing the superintendent to act unilaterally, unless a majority of the board directs otherwise. This arguable diminution in the plaintiffs' collective influence and official power suffices to confer standing on them to pursue their challenge.

2. The Governor's power under Const 1963, art 5, § 2 is nearly plenary. In the absence of a legislative veto within sixty days during a regular session, the Governor, by executive order submitted to the Legislature, may make changes in the organization of the executive branch or in the assignment of functions among its units that the Governor considers necessary for efficient administration. This power includes the authority to delegate, assign, or transfer existing power, responsibility, or authority within, among, or across not more than twenty principal departments. The Governor's power is limited only by constitutional provisions that would inhibit the Legislature itself. Because the Governor's action has the status of enacted legislation, it is entitled to the same presumption of constitutionality that an equivalent statute would enjoy. The board is not a fourth branch of government, nor is it a part of the legislative or the judicial branch. Rather, it is part of and within the executive branch, albeit as a constitutionally created entity with five specifically delineated, and therefore constitutionally inviolable, functions. However, the Governor did not transfer constitutionally granted functions from one executive branch agency, board, or entity to another. The functions transferred by the Executive Orders were created by the Legislature through enactment of relevant statutes, not by the people directly.

3. The board is not constitutionally required to head the Department of Education, and, under Const 1963, art 5, § 2, cl 2, the Governor may alter the current scheme and vest that function in the superintendent. Because the Legislature could have delegated such powers to the superintendent ab initio, the Governor is free to redistribute those powers within the Department of Education in any manner in which the Legislature could have assigned such authority originally or by amendment. Further, because the Legislature originally enacted these provisions, there can be no constitutional bar to a later repeal. Equally clearly, such a repeal would not impinge the board's constitutional function of leadership and general supervision over public education. Also, the Legislature could constitutionally transfer functions that it had previously vested in the board. If the Legislature can place a statutory function within an executive branch agency, board, or entity, the Governor by executive order may transfer the function to another executive branch agency, board, or entity.

4. The constitution does not require that the board function as the head of the Department of Education. By expressly declaring that the board may continue to set policies that the superintendent must carry out, the Governor has merely shifted legislatively delegated authority from the board to the superintendent. In no perceptible way does this facially infringe any of the board's constitutional powers or prerogatives under Const 1963, art 8, § 3. Because the Governor has protected the ultimate authority of the board, no improper transfer of its powers or diminution of its ultimate responsibilities has occurred. Nor has the Governor divested the board of ultimate control or limited that control in violation of Const 1963, art 8, § 3. There is no question that the board retains its constitutional authority to appoint the superintendent and to determine the superintendent's term of office and, by implication, that the board retains the power to shorten the term of office of the superintendent. The board also retains its statutory policy-making powers and its ability to provide leadership and general supervision, giving it authority over the superintendent and control over public education—ultimate control remains with the board.

Affirmed.

Justice CAVANAGH, joined by Justice KELLY, concurring in part and dissenting in part, stated that Executive Orders 1996-11 and 1996-12 are unconstitutional on their faces.

The Governor's power to reorganize the executive branch, while extensive, is not absolute. The Governor must work within the confines of the constitution and may not use his organizational powers to intrude into another constitutional body's sphere of authority. Thus, the Governor may not reorganize the Department of Education in such a way that infringes the Board of Education's constitutional role, regardless of whether the executive order purports merely to shift statutory functions.

Const 1963, art 8, § 3 vests the Board of Education with leadership and general supervision over all public education. The common understanding of these terms is that the board must be in charge of, direct, and control public education. To the extent that the Department of Education is the body that is in charge of executing educational programs mandated and funded by the Legislature, the board must maintain a position within that department that allows it to lead and supervise. It must act as the head of the Department of Education so that it may carry out its constitutional mandate. Any other structure would undermine the language of art 8, § 3. Art 8, § 3 establishes the superintendent as the executive arm of the board, responsible for implementation of the board's

policy mandates. It does not contemplate an independent superintendent with authority outside that given by the board.

Executive Order 1996-11 effectively undermines the board's position as the head of the Department of Education. It rescinds Executive Order 1965-9, which established the board as the head of the Department of Education, and it transfers all administrative statutory powers, duties, functions and responsibilities from the board to the superintendent. Under the order, the only connection the board has to the Department of Education is through the power to appoint the superintendent. It is unconstitutional on its face.

Similarly, the attempted transfer of specific statutory functions from the board to the superintendent by Executive Order 1996-12 violates the hierarchical relationship established between the board and the superintendent in art 8, § 3. While the Legislature may proscribe functions for the Department of Education to carry out, it may not specifically vest the authority over those functions in the superintendent. Likewise, the Governor may not shift legislatively proscribed functions from the board to the superintendent. Rather, it is for the board to determine which legislatively proscribed functions to delegate to the superintendent as its executive arm. Executive Order 1996-12 also is unconstitutional on its face.

*Mark H. Cousens; Sachs, Waldman, O'Hare, Helveston, Bogas & McIntosh, P.C.* (by *Mary Ellen Gurewitz*), and *White, Przybylowicz, Schneider & Baird, P.C.* (by *Arthur R. Przybylowicz*), for plaintiffs-appellants.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Thomas R. Wheeker*, Assistant Attorney General, for the defendant-appellee.

Amici Curiae:

*Linda L. Bruin* for Michigan Association of School Boards.

*Collins, Blaha & Slatkin* (by *William J. Blaha*) for Michigan Congress of Parents, Teachers and Students (Michigan PTA).

PER CURIAM. The Court of Appeals upheld the constitutionality of two gubernatorial executive orders that transferred functions from the State Board of Education to the Superintendent of Public Instruction. 230 Mich App 222; 583 NW2d 520 (1998). We affirm. MCR 7.302(F)(1). In doing so, we adopt as our own the following opinion of the Court of Appeals.

In this appeal of right, plaintiffs, elected members of the State Board of Education (hereafter the board), challenge, as being in excess of the authority vested in the Governor by Const 1963, art 5, § 2, and as being in derogation of the board's inherent constitutional prerogatives under Const 1963, art 8, § 3, the actions of the Governor in promulgating Executive Orders Nos. 1996-11 and 1996-12. These orders transfer various powers of the board to the Superintendent of Public Instruction. The Ingham Circuit Court agreed with plaintiffs' contentions, and, on cross-motions for summary disposition, MCR 2.116(C)(8) and (10), issued a declaratory judgment and permanent injunction against the implementation of these orders. We reverse.

I. FACTS AND BACKGROUND INFORMATION

The facts in this matter are not in dispute. On December 19, 1996, the Governor issued Executive Order No. 1996-11, which transferred "all of the administrative statutory powers, duties, functions and responsibilities" of the board to the superintendent by a "Type II transfer."[1] In effect, Executive Order No. 1996-11 made the superintendent, rather than the board, the administrative head of the Department of Education. This order was to become effective March 10, 1997.

---

[1] Pursuant to MCL 16.103(b); MSA 3.29(3)(b), a "type II transfer" allows the transferring of an existing board to a principal department.

Also on December 19, 1996, the Governor issued Executive Order No. 1996-12. Section 1 of this order transferred "all of the administrative statutory powers, duties, functions, and responsibilities" of the board, as set forth in approximately one hundred different sections of the Michi-

gan Compiled Laws, to the superintendent by a "Type II transfer." Section 2 transferred "[a]ll of the statutory rule making powers, duties, functions, and responsibilities" of the board, as set forth in an additional approximately thirty-nine sections of the Michigan Compiled Laws, to the superintendent by a "Type II transfer." Section 3 stated that "all the statutory policy making powers, duties, functions, and responsibilities" of the board, as set forth in approximately thirty-six different sections of the Michigan Compiled Laws, "shall remain with the State Board of Education." Executive Order No. 1996-12 was to become effective July 1, 1997.

Given the nature of the case before us, we must take note of the limits of judicial competence in such matters. We cannot serve as political overseers of the executive or legislative branches, weighing the costs and benefits of competing political ideas or the wisdom of the executive or legislative branches in taking certain actions, but may only determine whether some constitutional provision has been violated by an act (or omission) of the executive or legislative branch. As has been long recognized, when a court confronts a constitutional challenge it must determine the controversy "stripped of all digressive and impertinently heated veneer lest the Court enter—unnecessarily this time—another thorny and trackless bramblebush of politics." *Taylor v Dearborn Twp*, 370 Mich 47, 50, 51-52; 120 NW2d 737 (1963) (BLACK, J., joined by T. M. KAVANAGH, J.). Indeed, it is clear that issues of motive underlying the contested action are not justiciable. See also *Tenney v Brandhove*, 341 US 367, 37[7]; 71 S Ct 783; 95 L Ed 1019 (1951) (noting that it is "not consonant with our scheme of government for a court to inquire into the motives of legislat[ors]").

## II. STANDING[1]

As a threshold matter, we address plaintiffs' standing to maintain this suit and our jurisdiction to issue injunctive relief against the Governor. Plaintiffs represent precisely one-half the membership of the State Board of Education.

---

[1] Defendant has not filed a cross appeal challenging the Court of Appeals standing determination.

Voting as a bloc, plaintiffs have the ability to either determine the result of any matter coming before the board, by convincing one other member to join them, or to create an impasse if all other members of the board seek an opposite outcome. However, under Executive Orders Nos. 1996-11 and 1996-12, plaintiffs' ability to forestall action by the board in the exercise of statutorily delegated powers is limited because the superintendent may act unilaterally (unless a majority of the board directs otherwise). This arguable diminution in plaintiffs' *collective* influence and official power suffices, in our view, to confer standing on them to pursue this challenge. *House Speaker v State Administrative Bd*, 441 Mich 547, 556; 495 NW2d 539 (1993); see also *Raines v Byrd*, [521] US [811, 822-823]; 117 S Ct 2312, 2319; 138 L Ed 2d 849 (1997).

We would also note that, because a court at all times is required to question sua sponte its own jurisdiction (whether over a person, the subject matter of an action, or the limits on the relief it may afford), *Fox v Univ of Michigan Bd of Regents*, 375 Mich 238, 242; 134 NW2d 146 (1965), we have some doubt with respect to the propriety of injunctive relief against the Governor. It is clear that separation of powers principles, Const 1963, art 3, § 2, preclude mandatory injunctive relief, mandamus, against the Governor. *People ex rel Sutherland v Governor*, 29 Mich 320; 18 Am Rep 89 (1874). Whether similar reasoning also puts prohibitory injunctive relief beyond the competence of the judiciary appears to be an open question that need not be resolved in this case. We do note that the Supreme Court has recently recognized that declaratory relief normally will suffice to induce the legislative and executive branches, the principal members of which have taken oaths of fealty to the constitution identical to that taken by the judiciary, Const 1963, art 11, § 1, to conform their actions to constitutional requirements or confine them within constitutional limits. *Durant v Michigan*, 456 Mich 175, 205; 566 NW2d 272 (1997). Only when declaratory relief has failed should the courts even begin to consider additional forms of relief in these situations. *Id.* at 206. The need for utmost delicacy on the part of the judiciary, and respect for the unique

office of Governor, was similarly recognized in *People ex rel Johnson v Coffey*, 237 Mich 591, 602; 213 NW 460 (1927):

> The governor holds an exalted office. To him, and to him alone, a sovereign people has committed the power and the right to determine the facts in the proceeding before us. His decision of disputed question of fact is final. His finding of fact, if it has evidence to support it, is conclusive on this court. It would be unbecoming in us to impugn his motives, and unseemly and unlawful to invade his discretion.

### III. STANDARD OF REVIEW

This case is before us on cross-motions for summary disposition, MCR 2.116(C)(8) and (10). We review a trial court's ruling on a motion for summary disposition de novo. *G & A, Inc v Nahra*, 204 Mich App 329, 330; 514 NW2d 255 (1994). Indeed, summary disposition under either MCR 2.116(C)(8) or (10) will always present an issue of law for our determination. *Nahra, supra* at 330.

### IV. ANALYSIS

When reviewing constitutional provisions, the objective of such review is to effectuate the intent of the people who adopted the constitution. *Livingston Co v Dep't of Management & Budget*, 430 Mich 635, 641-642; 425 NW2d 65 (1988). The lodestar principle is that of "common understanding," the sense of the words used that would have been most obvious to those who voted to adopt the constitution.[2] *House Speaker v Governor*, 443 Mich 560, 577; 506 NW2d 190 (1993). Where, as here, there is a claim that two different provisions of the constitution collide, we must seek a construction that harmonizes them both. This is so because, both having been adopted simultaneously, neither can logically trump the other. *Kunzig v Liquor Control Comm*, 327 Mich 474, 480-481; 42 NW2d 247 (1950).

---

[2] Both sides have cited portions of the "Address to the People" and the record of the Constitutional Convention, both of which may properly be considered in interpreting constitutional provisions. *Bingo Coalition for Charity—Not Politics v Bd of State Canvassers*, 215 Mich App 405, 410; 546 NW2d 637 (1996). However, nowhere was this precise issue considered or discussed, and what remains is too ambiguous and short-lived to serve as a relia-

ble basis for resolution of the issue confronting us, particularly when the constitutional phraseology at issue is, in our view, straightforward in meaning and application on the record before us. See *Doe v Dep't of Social Services*, 439 Mich 650, 672-674; 487 NW2d 166 (1992).

The Governor's power under Const 1963, art 5, § 2, as has been noted, is nearly plenary.[3] In the absence of a legislative veto within sixty days during a regular session (or a full regular session of shorter duration), the Governor, by executive order submitted to the Legislature, may make changes in the organization of the executive branch or in the assignment of functions among its units that the Governor considers necessary for efficient administration. This power includes the authority to delegate, assign, or transfer existing power, responsibility, or authority within, among, or across not more than twenty principal departments. The Governor's power is limited only by constitutional provisions that would inhibit the Legislature itself. *House Speaker v Governor, supra* at 578-579; *Morris v Governor (On Remand, After Remand)*, 214 Mich App 604, 608; 543 NW2d 363 (1995). Because the Governor's action has the status of enacted legislation, it is entitled to the same presumption of constitutionality that an equivalent statute would enjoy. Therefore, the judiciary should construe the executive orders as constitutional unless unconstitutionality clearly appears. *Mahaffey v Attorney General*, 222 Mich App 325, 344; 564 NW2d 104 (1997) (statutes should be construed as constitutional unless unconstitutionality is clearly apparent).

---

[3] Const 1963, art 5, § 2, provides:

> All executive and administrative offices, agencies and instrumentalities of the executive branch of state government and their respective functions, powers and duties, except for the office of governor and lieutenant governor and the governing bodies of institutions of higher education provided for in this constitution, shall be allocated by law among and within not more than 20 principal departments. They shall be grouped as far as practicable according to major purposes.
>
> Subsequent to the initial allocation, the governor may make changes in the organization of the executive branch or in the assignment of functions among its units which

he considers necessary for efficient administration.
Where these changes require the force of law, they shall
be set forth in executive orders and submitted to the leg-
islature. Thereafter the legislature shall have 60 calendar
days of a regular session, or a full regular session if of
shorter duration, to disapprove each executive order.
Unless disapproved in both houses by a resolution con-
curred in by a majority of the members elected to and
serving in each house, each order shall become effective
at a date thereafter to be designated by the governor.

The board is a constitutional authority, empowered with
"[l]eadership and general supervision over all public educa-
tion, including adult education and instructional programs
in state institutions, except as to institutions of higher edu-
cation granting baccalaureate degrees." Const 1963, art 8,
§ 3.[4] The board serves "as the general planning and
coordinating body for all public education, including higher
education," and as advisor to "the legislature as to the
financial requirements in connection therewith." Const
1963, art 8, § 3, cl 1. The board consists of eight members
nominated by party conventions and elected at large for
terms of eight years as prescribed by law. *Id.*, § 3, cl 3. The
superintendent is appointed by the board, serves as its
chairperson, but without voting rights, and is imbued by the
constitution with responsibility for execution of board poli-
cies. *Id.*, § 3, cl 2. The Governor serves as an ex-officio
member of the board, without the right to vote. *Id.*, § 3, cl
3. As are all such administrative agencies, the board is part
of the executive branch of government.[5] *Judges of the 74th
Judicial Dist v Bay Co*, 385 Mich 710, 727; 190 NW2d 219
(1971).

[4] Const 1963, art 8, § 3 provides, in part:

Leadership and general supervision over all public edu-
cation, including adult education and instructional pro-
grams in state institutions, except as to institutions of
higher education granting baccalaureate degrees, is vested
in a state board of education. It shall serve as the general
planning and coordinating body for all public education,
including higher education, and shall advise the legislature
as to the financial requirements in connection therewith.

The state board of education shall appoint a superinten-
dent of public instruction whose term of office shall be

determined by the board. He shall be the chairman of the board without the right to vote, and shall be responsible for the execution of its policies. He shall be the principal executive officer of a state department of education which shall have powers and duties provided by law.

[5] Because members of the board are neither appointed nor directly overseen by the Legislature or the judiciary, the board must be part of the executive branch. There is no fourth branch of government. *Walker v Wolverine Fabricating & Mfg, Inc*, 425 Mich 586, 607; 391 NW2d 296 (1986); *Civil Service Comm v Auditor General*, 302 Mich 673, 682; 5 NW2d 536 (1942).

Nonetheless, plaintiffs contend that the board is not part of or within the executive branch. In this regard, we note that Const 1963, art 3, § 2 provides that the powers of government are divided into three branches: legislative, executive, and judicial. In *Federated Publications v Michigan State Univ Bd of Trustees*, 221 Mich App 103, 113; 561 NW2d 433 (1997),[2] [the Court of Appeals] dealt with a somewhat similar argument, to the effect that the Open Meetings Act, MCL 15.261 *et seq.*; MSA 4.1800(11) *et seq.*, does not apply to public universities that were asserted to be "coequal branches of government." [The Court of Appeals] responded unequivocally:

We disagree. In *In re 1976 PA 267* [400 Mich 660; 255 NW2d 635 (1977)], the Court noted that the powers of government were divided among *three* branches of government pursuant to Const 1963, art 3, § 2. It further noted that the separation of powers set forth in the constitution was "designed to preserve the independence of the three branches of government." *Id.* at 662. Although various cases have stated that public universities are branches of government coequal with the Legislature, the constitution does not contain any provision that elevates them to a fourth branch of government. See *Walker v Wolverine Fabricating Mfg Co, Inc*, 425 Mich 586, 607; 391 NW2d 2[9]6 (1986). Because autonomous state uni-

[2] This Court has granted leave to appeal in *Federated Publications*. 458 Mich 865 (1998).

versities have not achieved that status under the constitution, *In re 1976 PA 267* is inapplicable to this case. [*Federated Publications, supra* at 113-114 (emphasis in original).]

We apply the same reasoning here. The board is not a fourth branch of government. To so hold would be to directly contravene the plain meaning of Const 1963, art 3, § 2. Further, the board is not a part of the legislative or the judicial branch. Rather, the board is part of and within the executive branch, albeit as a constitutionally created entity with five specifically delineated, and therefore constitutionally inviolable, functions.[6] In this regard, the constitutional location of the board's functions within the executive branch is similar to that of the State Transportation Commission, under Const 1963, art 5, § 28, the Civil Rights Commission, under Const 1963, art 5, § 29, and the Civil Service Commission, under Const 1963, art 11, § 5.[7]

---

[6] These functions are (1) to exercise "[l]eadership and general supervision over all public education, including adult education and instructional programs in state institutions, except as to institutions of higher education granting baccalaureate degrees," (2) to serve "as the general planning and coordinating body for all public education, including higher education," (3) to "advise the legislature as to the [financial] requirements in connection therewith," (4) to appoint the superintendent, and (5) to determine the term of office of the superintendent. Const 1963, art 8, § 3.

[7] We note that the Civil Service Commission's functions are not set out in the article of Const 1963 dealing with the executive branch but in the article dealing with public officers and employment. However, in *Reed v Civil Service Comm,* 301 Mich 137, 152; 3 NW2d 41 (1942), the Michigan Supreme Court, in construing the 1941 amendment to Const 1908 that created the Civil Service Commission as a constitutional rather than a statutory entity, referred to "rights . . . affected by the arbitrary or unreasonable action of an *administrative* agency." (Emphasis supplied.) The logical repository for *administrative,* as compared to legislative or judicial, functions is in the executive branch. But see the concurrence of CHANDLER, C.J., joined by BUSHNELL, J.:

Unquestionably the civil service commission is a constitutional body possessing plenary power. In its acts it is not subject to control or regulation by either [sic] the executive, legislative or judicial branch of our State government. [*Reed, supra,* at 163.]

See also *Viculin v Dep't of Civil Service*, 386 Mich 375, 385-386, n 11; 192 NW2d 449 (1971) (boards and commissions created throughout the constitution are administrative bodies), *Judges of the 74th Judicial Dist, supra* at 727 (administrative agencies are part of the executive branch of government).

The constitution contains specific requirements relating to the Department of Education. Const 1963, art 8, § 3, cl 2 specifies that the superintendent "shall be the principal executive officer of a state department of education which shall have powers and duties provided by law." This must be read as some limitation on the Governor's generally plenary power under Const 1963, art 5, § 2, subject to veto by joint legislative resolution, to reorganize state government into not more than twenty principal departments. It may be logically concluded, given the fact that the Department of Education is specifically mentioned in the constitution, that the department is one of the twenty "principal departments."

The parties do not suggest that the executive orders at issue engender a violation of the constitutional limitation to twenty principal departments. Similarly, the parties do not suggest that the Governor sought to implement such orders before the expiration of the constitutionally prescribed sixty regular legislative session days or a full regular session of shorter duration. Finally, the parties do not suggest that the Legislature, by concurrent resolution of a majority of the members elected to and serving in each house, disapproved either or both of the executive orders on the basis of a concern about the board's constitutional prerogatives or authority.

The executive orders at issue transfer a variety of statutory powers, both administrative and regulatory, from the board to the superintendent. Both orders explicitly provide:

Nothing in this Executive Order should be construed to diminish the constitutional authority of the State Board of Education to provide leadership and general supervision over all public education, including adult education and instructional programs in state institutions, except as to institutions of higher

education granting baccalaureate degrees, and its authority to serve as the general planning and coordinating body for all public education including higher education, and to advise the legislature as to the financial requirements in connection therewith. [Executive Order No. 1996-11, ¶ 2; Executive Order No. 1996-12, ¶ 5.]

Executive Order No. 1996-12 additionally specifies that the board "shall retain its policy making authority with regard to these statutory provisions by determining the policies, if any, on which the administration of these provisions shall be based."

The first factor critical to our determination is that the executive orders only address the powers and duties that are conferred upon the board by statute. Contrary to plaintiffs' assertion, the Governor did not transfer *constitutionally* granted functions from one executive branch agency, board, or entity to another. Const 1963, art 8, § 3 does not state that the board is to be the head of the Department of Education. Rather, this language is contained in § 301 of the Executive Organization Act of 1965, MCL 16.401; MSA 3.29(301).[8] Similarly, the functions transferred by Executive Order Nos. 1996-11 and 1996-12 were created by the Legislature through enactment of the relevant statutes, not by the people directly through adoption of Const 1963, art 8, § [3].[9]

---

[8] As noted by plaintiffs, Lieutenant and Acting Governor William Milliken in Executive Order No. 1965-[9] (1) established the Department of Education in the executive branch, (2) established the state board as the head of the Department of Education, (3) established the superintendent as the principal executive officer of the Department of Education, and (4) stated that, "[T]he state board of education is hereafter responsible for carrying out the functions, duties, and responsibilities of the department of education in accordance with the constitution and the statutes of this state." As noted in *House Speaker, supra* at 579, when the Governor makes changes within the executive branch through the executive order procedure, he has the authority, in effect, to enact laws to carry out those changes. See also *Morris, supra* at 612, quoting *House Speaker* to the effect that the Governor's reorganization powers are equal to the Legislature's initial and subsequent reorganization powers. Thus, we consider Lieutenant and Acting Governor William Milliken's actions in Executive Order No. 1965-[9] to be equivalent

to the Legislature's actions in § 301 of the Executive Organization Act of 1965.

[9] Executive Order No. 1996-11 transfers "administrative statutory powers, duties, functions and responsibilities" of the board. These "statutory powers" are found in MCL 16.401; MSA 3.29(301), MCL 16.107(a); MSA 3.29(7)(a), and MCL 16.109; MSA 3.29(9). Section 1 of Executive Order No. 1996-12 transfers approximately one hundred "administrative statutory powers, duties, functions, and responsibilities" of the board, as found in the relevant provisions of the Michigan Compiled Laws. Section 2 transfers the board's "statutory rule making powers, duties, functions, and responsibilities" as found in approximately thirty-nine provisions of the Michigan Compiled Laws. The statutory sections cited in Executive Order No. 1996-12 are simply too numerous to cite in this opinion.

Therefore, the board is not *constitutionally* required, as part of its function of providing leadership and general supervision over all public education, to head the Department of Education. We believe it axiomatic that the Governor may, under Const 1963, art 5, § 2, cl 2, alter the current scheme and vest that function in the superintendent. Because the Legislature could have delegated such powers to the superintendent *ab initio*, the Governor is free to redistribute those powers within the Department of Education in any manner in which the Legislature could have assigned such authority originally or by amendment. See *House Speaker, supra.*

We note that plaintiffs' counsel at oral argument appeared to concede that the Legislature could constitutionally *repeal* the sections of the statutes delineating the functions that Executive Order No. 1996-12 transferred. Counsel was unwilling to concede, however, that the Legislature could constitutionally *transfer* such functions away from the board. Clearly, plaintiffs are standing on unstable ground. Because the Legislature originally enacted these statutory provisions, there can be no constitutional bar to a later repeal. Equally clearly, such a repeal would not impinge upon the board's constitutional function of leadership and general supervision over public education.

We also believe it clear that the Legislature could constitutionally *transfer* functions that it had previously vested in the board. Indeed, we see no functional difference between a repeal of such functions and a transfer of such functions.

Here, the transfers in question were accomplished by executive order rather than legislative action but, as noted above, under *House Speaker, supra,* and *Morris, supra,* when the Legislature allocates a function, the Governor may thereafter change that allocation through the exercise of the Governor's reorganization powers under Const 1963, art 5, § 2, cl 2. As *House Speaker, supra* at 579, specifically held:

> The constitution, then, specifically recognizes that, where the Governor feels compelled to make certain changes within the executive branch, he has authority, through the executive order procedure, in effect, to enact laws to carry out those changes. The only way to preclude such changes is through a properly supported legislative veto. *In other words, after the initial executive branch organization, the Governor's reorganization powers are equal to the Legislature's initial and subsequent reorganization powers.* [Emphasis added.][10]

---

[10] See also *Morris, supra* at 609:

> [T]he Governor's reorganization powers are equal to the Legislature's *initial* as well as subsequent reorganization powers. *In other words, when the Governor acts under this constitutional provision by means of an executive order, and that order is not overturned by the Legislature, it is as if the Legislature had acted.* [First emphasis in original; second emphasis supplied.]

---

Simply put, and as argued by the Governor, if the Legislature can place a *statutory* function within an executive branch agency, board, or entity, the Governor by executive order may transfer the function to another executive branch agency, board or entity.[11]

---

[11] The affidavits that plaintiffs Kathleen Straus and Barbara Roberts Mason submitted to the lower court do not alter our conclusion. We first note that these affidavits contain a mixture of fact and opinion. Secondly, and perhaps more importantly, while these affidavits describe the current process by which the board carries out its *legislatively* derived functions, it does not logically follow

that such functions are inherent to, and therefore inseparable from, the board's *constitutionally* derived functions. Therefore, we do not agree that these affidavits support a finding, advanced by plaintiffs, that the executive orders transferred *"all* powers which are a necessary incident of the [State] Board's overarching power or duty to exercise leadership and general supervision [over] all public education in [the state of] Michigan." (Emphasis supplied.)

Plaintiffs also argue that contemporaneous legislative (i.e., the enactment of § 301 of the Executive Organization Act of 1965) and gubernatorial (i.e., the issuance of Executive Order No. 1965-9) actions constitute "understandings" that Const 1963, art 8, § 3  should be read as requiring the board to be the head of the Department of Education. We disagree. Rather, we regard these actions not as signaling a contemporaneous understanding that the constitution *requires* such an outcome but rather as expressing a policy determination that such an outcome was then desirable. Under Const 1963, art 3, § 2,  we do not function as reviewers of such policy determinations, whether they are made by the legislative or executive branch, and we therefore express no opinion with respect to the wisdom, or lack thereof, of making the superintendent the head of the Department of Education. Rather, we hold that the constitution does not *require* that the board function in this capacity.[12]

---

[12] In this regard, we note that the Address to the People accompanying Const 1963, art 8, § 3  stated that "The superintendent would be considered as *administrative head* of a state department of education and as such [sh]ould be a staff officer to the governor and on his administrative board." (Emphasis supplied.)

By expressly declaring that the board may continue to set policies pursuant to which the superintendent shall carry out these various statutorily created responsibilities, the Governor has merely shifted legislatively delegated authority from the board to the superintendent. In no perceptible way does this facially infringe any of the board's constitutional powers or prerogatives under Const 1963, art 8, § 3. Indeed, Executive Order No. 1996-12 specifically provides that the board shall *retain* its statutory *policy-making* powers, duties, functions, and responsibilities. Because the Gov-

ernor has protected the ultimate authority of the board with apparent fidelity to Const 1963, art 8, § 3, no improper transfer of its powers or diminution of its ultimate responsibilities has occurred. See *Bays v Dep't of State Police*, 119 Mich App 719, 721-722; 326 NW2d 620 (1982) (no improper delegation of decision-making power of the Civil Service Commission where it retained "ultimate power over those decisions with which it is charged").

Our second major area of analysis concerns whether the Governor's actions divest the board of "control" over the system of public education in Michigan. We do not believe that the Governor has divested the board of ultimate control or that the Governor's actions limit that control in violation of Const 1963, art 8, § 3.

The party challenging the facial constitutionality of an act "must establish that no set of circumstances exists under which the [a]ct would be valid. The fact that the . . . [a]ct might operate unconstitutionally under some conceivable set of circumstances is insufficient . . . ." *United States v Salerno*, 481 US 739, 745; 107 S Ct 2095; 95 L Ed 2d 697 (1987). Further, "if any state of facts reasonably can be conceived that would sustain [an act], the existence of the state of facts at the time the law [or, here, an executive order] was enacted must be assumed." 16 Am Jur 2d, Constitutional Law, § 218, p 642. In addition, "[a] statute [or, here, an executive order] may be constitutional although it lacks provisions which meet constitutional requirements, if it has terms not excluding such requirements, and in this situation the court is justified in holding that the statute was intended to be subject to such requirements, and that those requirements are to be considered as embodied in the statute." *Id.*, § 225, p 659.[13]

---

[13] Quoted with approval in *Council of Organizations v Governor*, 455 Mich 557, 568-569; 566 NW2d 208 (1997).

---

Here, Executive Order No. 1996-11 states that nothing within it is to be construed to diminish the constitutional authority of the board to provide leadership and general supervision over all public education. Thus, the terms of the executive order specifically *include* the requirements of

Const 1963, art 8, § 3. Additionally, we can easily conceive of a state of facts in which the superintendent exercises the administrative functions of the head of the Department of Education while the board continues to exercise its leadership and general supervision over public education. Indeed, construing Executive Order No. 1996-11 in its entirety, we conclude that this is what the Governor intended. Executive Order No. 1996-11 basically involves the internal organization of the Department of Education and, as such, would have minimal effect on the functioning of the board. It would also appear to be exactly the type of transfer envisioned by Const 1963, art 5, § 2 and *House Speaker, supra.* We do not discount the fact that the superintendent, or his successor(s), could, conceivably and at some time in the future, encroach upon the board's constitutionally granted functions. However, unless and until such an encroachment actually occurs, the issue is not ripe for adjudication. *General Motors Corp v Attorney General*, 294 Mich 558, 568; 293 NW 751 (1940).

Similarly, we find no constitutional bar prohibiting the transfer of functions effectuated by Executive Order No. 1996-12. As noted above, this order transfers the "*administrative* statutory powers, duties, functions and responsibilities" of the board to the superintendent. Plaintiffs argue that these transfers directly affect the authority of the board and are not "concerned with the organization and powers of the Department of Education." However, plaintiffs have not established that there is no set of circumstances under which the transfers would be valid and we note that, as with Executive Order No. 1996-11, Executive Order No. 1996-12 states that nothing within it is to be construed to diminish the constitutional authority of the board to provide leadership and general supervision over all public education. Furthermore, as noted above, Executive Order No. 1996-12 explicitly provides that the board shall retain certain statutory policy-making powers and responsibilities.

In this respect, we note that there is no question that the board retains its constitutional authority to appoint the superintendent and to determine the superintendent's term

of office and, by implication, this language suggests that the board also retains the power to shorten the term of office of the superintendent. The board also retains its statutory policy-making powers and its ability to provide "leadership and general supervision." These powers, retained by the board, certainly give the board authority over the superintendent and control over public education. We therefore, under the facts before us, find that *ultimate* control remains with the board.

In conclusion, we do not believe that either Executive Order No. 1996-11 or Executive Order No. 1996-12 facially[14] infringes any of the board's constitutional powers or prerogatives under Const 1963, art 8, § 3. Given that the Governor has protected the board's ultimate authority over our educational system, we hold that the Governor has made no improper transfer of its powers or responsibilities. We further hold that the executive orders at issue are within the scope of the Governor's authority under Const 1963, art 5, § 2.

---

[14] We are not blind to the possibility that the superintendent could exceed these boundaries. However, we have no reason to anticipate that such a public officer will engage in *ultra vires* actions. Furthermore, on proper complaint, the judiciary will inquire into the matter and, if the board's constitutional prerogatives have been invaded, redress the infringement. Until such time, no such issue is ripe for adjudication. *United Public Workers of America (CIO) v Mitchell*, 330 US 75, 89-91; 67 S Ct 556; 91 L Ed 754 (1947); *General Motors, supra* at 568. Where a constitutional question is presented anticipatorily, the Court is required by the limits on its authority to decline to rule. *Sullivan v Bd of Dentistry*, 268 Mich 427, 429-430; 256 NW 471 (1934).

---

We reverse the decision of the circuit court and, pursuant to MCR 7.216(A)(7), grant a judgment of no cause for action in favor of the defendant. We also give this decision immediate effect pursuant to MCR 7.215(E)(2). We do not retain jurisdiction. No taxable costs pursuant to MCR 7.219, a question of public significance being involved. [230 Mich App 224-242.]

WEAVER, C.J., and BRICKLEY, TAYLOR, CORRIGAN, and YOUNG, JJ., concurred.

CAVANAGH, J. (*concurring in part and dissenting in part*). I concur in the majority's determination that the Board of Education and the Department of Education are part of the executive branch. However, I cannot agree with its holding that Executive Orders 1996-11 and 1996-12 are constitutional. The majority does not give effect to the language of Const 1963, art 8, § 3 or to the historical circumstances surrounding its adoption. Article 8, § 3 explicitly vests the Board of Education with "[l]eadership and general supervision" over public education. It also subordinates the superintendent to the authority of the board, making him responsible for the execution of the board's mandates. I believe the Governor cannot subvert this constitutional structure by shifting responsibilities from the board to the superintendent. Therefore, I dissent.

### I. THE GOVERNOR'S AUTHORITY OVER THE EXECUTIVE BRANCH

I agree with the majority's holding that the board and the Department of Education are part of the executive branch of government, and, as such, are subject to the Governor's authority to reorganize the executive branch under Const 1963, art 5, § 2. *House Speaker v Governor*, 443 Mich 560, 587; 506 NW2d 190 (1993). The Governor may "enact laws affecting the executive branch, just as the Legislature can." *Id.* at 578. However, while the Governor's power to reorganize the executive branch is extensive, it is not absolute. First, the text of art 5, § 2 allows the Legislature to "veto" an executive order that it does not agree with. *Soap & Detergent Ass'n v Natural Resources*

*Comm*, 415 Mich 728, 752; 330 NW2d 346 (1982).[1]
Second, and relevant to this case, the Governor must
work within the confines of the constitution itself. He
cannot use his organizational powers to intrude into
another constitutional body's "sphere of authority."
*Council No 11, AFSCME v Civil Service Comm*, 408
Mich 385, 408; 292 NW2d 442 (1980).

The majority relies on the Governor's argument that
he is within his art 5, § 2 power because the execu-
tive orders at issue only involve the transfer of statu-
tory functions. In addition, both of the orders specifi-
cally state "[n]othing in this executive order should
be construed to diminish the constitutional authority
of the State Board of Education to provide leadership
and general supervision over all public educa-
tion . . . ." However, such superficial arguments fail
to give weight to the constitutional authority vested
in the Board of Education. The Governor cannot reor-
ganize the Department of Education in such a way
that infringes the board's constitutional role, regard-
less of whether the executive order purports merely
to shift "statutory" functions. *House Speaker*, 443
Mich 592. If the board's position as the head of the
Department of Education is mandated by the consti-
tution, as argued by plaintiffs, then the prior legisla-
tive[2] and executive[3] pronouncements are merely
statements recognizing the structure of the Depart-
ment of Education that is required by the constitu-
tion. Similarly, if the statutory duties placed on the
board by the Legislature are mandated by the consti-
tution, then they may not be shifted to another part of

---

[1] No such legislative veto occurred in this case.

[2] MCL 16.405; MSA 3.29(305).

[3] Executive Order 1965-9.

the executive branch. Moreover, the inclusion of the language "[n]othing in this Executive Order should be construed to diminish the constitutional authority of the State Board of Education" cannot save the executive order if it actually does infringe on the board's constitutional authority. See *Council of Organizations & Others for Ed About Parochiaid, Inc v Governor*, 455 Mich 557, 570; 566 NW2d 208 (1997) (in construing the constitutionality of a statute, the reviewing court must examine the statute's requirements rather than the method by which the statute is administered).

In short, determining whether the Governor was acting within his power under art 5, § 2 requires one to analyze the relationship between the State Board of Education and the State Superintendent established in Const 1963, art 8, § 3. If the executive orders in this case violate the respective powers and duties intended under that portion of the constitution, then the executive orders cannot stand.

## II. CONST 1963, ART 8, § 3 AND THE AUTHORITY OF THE BOARD OF EDUCATION

The respective duties of the Board of Education and the Superintendent of Public Instruction are provided in Const 1963, art 8, § 3. That constitutional provision provides in pertinent part:

> Leadership and general supervision over all public education, including adult education and instructional programs in state institutions, except as to institutions of higher education granting baccalaureate degrees, is vested in a state board of education. It shall serve as the general planning and coordinating body for all public education, including higher education, and shall advise the legislature as to the financial requirements in connection therewith.

> The state board of education shall appoint a superinten-
> dent of public instruction whose term of office shall be
> determined by the board. He shall be the chairman of the
> board without the right to vote, and shall be responsible for
> the execution of its policies. He shall be the principal exec-
> utive officer of a state department of education which shall
> have powers and duties provided by law.

The dispute in the present case centers on the
meaning of "[l]eadership and general supervision over
all public education." Plaintiffs argue that by vesting
the board with "[l]eadership and general supervision,"
the constitution gives the board broad powers to con-
trol public education in the state. This power requires
that the board head the Department of Education,
and the superintendent is designed to serve the board
by executing its directives. Defendant, on the other
hand, argues that "[l]eadership and general supervi-
sion" gives the board a more remote, policy-making
function, while the superintendent is responsible for
the day-to-day operation and administration of the
Department of Education.

### A. RULES OF CONSTITUTIONAL CONSTRUCTION

When interpreting the constitution, a reviewing
court must first examine the "common understand-
ing" of its language. *Traverse City School Dist v
Attorney General*, 384 Mich 390, 405; 185 NW2d 9
(1971). This is because " '[a] constitution is made for
the people and by the people. The interpretation that
should be given it is that which reasonable minds, the
great mass of the people themselves, would give it.' "
*Id.* (emphasis deleted). If the meaning of the words
used is clear, then the court need not look any fur-
ther. *Attorney General v State Bd of Assessors*, 143
Mich 73, 76-77; 106 NW 698 (1906). Where, however,

there is no clear common understanding from the language used, the court may also look to "the circumstances surrounding the adoption of a constitutional provision and the purpose sought to be accomplished" by the provision. *Council of Organizations*, 455 Mich 569; *Kearney v Bd of State Auditors*, 189 Mich 666, 673; 155 NW 510 (1915).

### B. TEXT OF CONST 1963, ART 8, § 3

The majority gives too little weight to the verbiage used in art 8, § 3. While the constitution does not specifically state that the Board of Education is to "head" the Department of Education, it does vest the board with "[l]eadership and general supervision over all public education." I believe the common understanding of these terms means that the board must be in charge of, direct, and control public education. Justice BLACK's concurrence in *Welling v Livonia Bd of Ed*, 382 Mich 620, 625; 171 NW2d 545 (1969), explained that through the adoption of the 1963 Constitution:

> [T]he framers proposed and the people adopted a new policy for administration of the system. Now the State board of education, unfettered by those qualifying words "prescribed by law" or "provided by law," is armed and charged exclusively with the power and responsibility of administering the public school system which the legislature has set up and now maintains pursuant to section 2 of the eighth article. By section 3 of the same article, the board has been directed—not by the legislature but by the people—to lead and superintend the system and become, exclusively, the administrative policy-maker thereof.

See also *Council of Organizations*, 455 Mich 588 (CAVANAGH, J., concurring) ("The term 'control' is synonymous with the constitutional phrase

'[l]eadership and general supervision,' Const 1963, Art 8, § 3, in the context of public education").

Indeed, the verb "lead" is commonly defined as to "direct the operations, activity, or performance of," to "have charge of," or to "go at the head of." *Webster's Ninth New Collegiate Dictionary*, p 679. Supervise is to "superintend" or to "oversee." *Id.* at 1185. To give effect to these terms, the board must be placed in a position to "lead" and "supervise" public education. To the extent that the Department of Education is the body that is in charge of executing educational programs mandated and funded by the Legislature, the board must maintain a position within that department that allows it to lead and supervise. In other words, the board must act as the head of the Department of Education so that it may carry out its constitutional mandate. Any other structure would undermine the language of art 8, § 3.

This provision also defines the duties of the State Superintendent of Public Instruction. The superintendent is responsible for the execution of the board's mandates, and serves as the principal executive officer of the State Department of Education. Significantly, the provision does not place the superintendent as the "head" of the Department of Education, but, rather, as the "principal *executive* officer." This language tracks that of the previous sentence, which makes the superintendent "responsible for the *execution* of [the board's] policies." Thus, the language of art 8, § 3 establishes the superintendent as the executive arm of the board and makes him responsible for implementation of the board's mandates. It does not contemplate an independent superintendent with authority outside that given by the board.

The language of art 8, § 3  establishes the Board of Education at the top of the education pyramid in this state. The superintendent follows next, and is charged with executing the mandates of the board. This structure requires the board to "lead" and "supervise" the Department of Education, because that is the department charged with executing educational programs throughout the state.[4]

### III. CIRCUMSTANCES SURROUNDING THE ADOPTION OF ART 8, § 3

The majority also ignores the history and circumstances surrounding the adoption of art 8, § 3. This history and circumstances evidence a clear intent to establish an hierarchical relationship between the board and the superintendent where the superintendent's power and authority flow from the board.

---

[4] Two other provisions of the constitution contemplate the existence of an elected board heading an executive department. Article 5, § 3 states that "[w]hen a board or commission is at the head of a principal department, *unless elected or appointed as otherwise provided in this constitution,* the members thereof shall be appointed by the governor by and with the advice and consent of the senate." (Emphasis added.) The conventional comment accompanying this provision further explains that the Governor generally has the power to appoint boards, except "in the case of *elected boards* and boards and commissions which have authority to name their executive heads." (Emphasis added.) The Board of Education is the only elected board under the 1963 Constitution. See *Viculin v Dep't of Civil Service,* 386 Mich 375, 385-386, n 11; 192 NW2d 449 (1971). Therefore, art 5, § 3 seems to refer to the Board of Education as the head of the Department of Education.

Moreover, art 5, § 9  requires that "[s]ingle executives heading principal departments and *the chief executive officers of principal departments headed by boards or commissions* shall keep their offices at the seat of government . . . ." (Emphasis added.) This section references exactly the structure contemplated by art 8, § 3—the department is headed by the Board of Education, and the superintendent is the principal executive officer.

Thus, neither the Legislature nor the Governor should be able to alter this relationship by shifting authority for certain responsibilities from the board to the superintendent.

Before the 1963 Constitution, the Superintendent of Public Instruction was designated to supervise public education in the state. As explained by the Court of Appeals dissent:

> Const 1835, art 10, § 1 provided for a Superintendent of Public Instruction, to be appointed by the Governor, "whose duties shall be prescribed by law." Const 1850, art 8, § 1 provided for the popular election of a Superintendent of Public Instruction who, under art 13, § 1, "shall have the general supervision of public instruction, and his duties shall be prescribed by law." Const 1850, art 13, § 9 also created an elected board charged with general supervision over the state normal school and other duties "prescribed by law." Const 1908, art 11, § 2 also provided for the popular election of the Superintendent of Public Instruction, giving him the responsibility for "general supervision of public instruction in the state"; Const 1908, art 11, § 6 also continued the limitation on the role of the elected board to supervision of the state normal college and the state normal schools and to such duties "prescribed by law." [230 Mich App 248-249.]

However, Const 1963, art 8, § 3 substantially changed the relationship between the board and the superintendent. First, the board, rather than the superintendent, is responsible for the leadership and general supervision of public education. The superintendent is charged with executing the mandates of the board and is also assigned the position of "principal executive officer of a state department of education." Const 1963, art 8, § 3.

Indeed, this shift in power is one of the main themes running through the convention debates.[5] For example, the committee on education stated in support of the proposed constitutional language:

> The enlarged state board finally gives Michigan a policy making body on a state level similar to the local boards of education. Michigan is 1 of 3 states that does not have such a board. For many years there have been grave doubts about the advisability of policies and procedures determined by a superintendent of public instruction alone. [1 Official Record, Constitutional Convention 1961, pp 1188-1189.]

Delegate Romney expounded on the transfer of power in his remarks:

> The present constitution gives the superintendent of public instruction very broad authority over education, but he is not properly equipped either from the standpoint of staff and department or from the standpoint of ability to cover the full field to discharge that function. This contemplates the establishment of this board with these broad functions and, certainly, this provides a more suitable means of discharging these important functions. [*Id.* at 1190.]

Delegate Brake voiced his opinion that the Board of Education should be the dominant force in educational decision making:

> [T]he 8 members of the board should lay down the policy to be followed by this board. They should make the deci-

---

[5] One of the most instructive sources for discerning the circumstances surrounding the adoption of a constitutional provision is the statements of constitutional delegates during the floor debates before passage of the provision. *House Speaker*, 443 Mich 580-581. While these statements are not decisive with respect to the meaning or intent of the people in ratification, they can provide important background and are particularly helpful when there is " 'a recurring thread of explanation binding together the whole of a constitutional concept.' " *Id.* at 581, quoting *Regents of the Univ of Michigan v Michigan*, 395 Mich 52, 60; 235 NW2d 1 (1975).

sions. They know what the problems are. They should be the dominant force. . . . My first premise is that the board ought to run this show. [*Id.* at 1193.]

Thus, the 1963 Constitution contemplated a marked shift in power from the superintendent to the board. In particular, the power to implement "policies and procedures," *id.* at 1188, formerly determined by the superintendent was transferred to the board.[6]

Second, the superintendent is no longer elected, but, rather, appointed by the board. The board also selects the term to be served as superintendent. Through this change, the superintendent is no longer directly accountable to the electorate. Instead, the superintendent's authority flows from the board.

---

[6] There was also some discussion that this shift in power also necessarily established the Board of Education as the head of the Department of Education. For example, the following colloquy occurred between Delegates Faxon and Bentley:

*Mr. Faxon:* . . . *The idea will be that the department over which the superintendent will be the executive officer will also be headed by the state board of education?* Is that correct, Mr. President and Mr. Bentley?

*Mr. Bentley:* Mr. President, we have not entered into this discussion at this time. We are merely saying that we believe the word "office" should be substituted for the word "department," since "department" better specifies what it means than "office."

*Mr. Faxon:* Well, the only thing, Mr. President, *that I just want to make sure is that the responsibility for the administration of that department, the ultimate responsibility will rest with the state board of education.* If that is the intention with the substitution of the word "department," then I just want to be sure that I understand it, and I'll go along with this.

*Mr. Bentley:* Mr. President, we are making no change anywhere, except to make it a department instead of an office. [2 Official Record, Constitutional Convention 1961, pp 2574-2575 (emphasis added).]

Much of the debate at the constitutional convention focused on the change relative to the roles of the board and the superintendent and the source of the superintendent's authority under the new constitution. In particular, the delegates extensively debated a proposal to have the superintendent elected by the public to a four-year term rather than appointed by the board. *Id.* at 1212. The delegates supporting an elected superintendent were concerned that the superintendent derived his authority from the board as opposed to the electorate. As explained by the minority report of the education committee:

> The heart of the question over whether or not the state superintendent of public instruction should be elected by the people or appointed by a state board of education is the question: is Michigan to have a strong superintendent of public instruction who is to be a policymaker by dint of his own strength as the choice of the people, or are we to have a superintendent who is granted his strength and guaranteed his weaknesses by virtue of the whim of a board of education which, even if elected, will by its very nature be more difficult to attune to the public will? [*Id.* at 1189.]

The supporters of the amendment voiced concern over the weakened role of the superintendent. Delegate Douglas, one of the cosponsors of the amendment, opined:

> [I]t is difficult for an appointed official to exert state educational leadership when each major decision must be reviewed and approved by his board. I ask you, with the committee proposal to whom is he responsible? He is not responsible to the people. He is not responsible to the governor. He is a creature of the board, and he is responsible to the board. Every time a major decision has to be made on the administrative board, he has to go back to those people who hired him. [*Id.* at 1216.]

Another cosponsor, Delegate Hart, expressed her belief that

> [i]n our new constitution the superintendent has been demoted. . . . The superintendent, then, is no longer a strong, independent head directly responsible to the people but he is an executive secretary who has no final voice in educational decisionmaking. He is a subservient agent. His position in the governor's cabinet is weakened because he no longer speaks for himself as a representative of the people. He may speak only for those whom he represents: the 8 members of the state board. [2 Official Record, Constitutional Convention 1961, p 3147.]

However, the delegates rejected the concerns of Delegates Hart and Douglas by giving the board the power to appoint. The delegates also rejected a similar proposal that would have changed the provision so that the superintendent was appointed by the Governor with the advice and consent of the Board of Education. See 1 Official Record at 1219-1221. In doing so, the delegates reinforced the hierarchical structure presented by the language of art 8, § 3. The superintendent is the executive arm of the Board of Education, and derives authority from the board. The superintendent does not have independent authority derived from the electorate or the Governor.

Third and finally, neither the board nor the superintendent has duties "proscribed by law" as they did in previous constitutions. Instead, the 1963 Constitution recognizes four broad functions of the board: (1) exercising leadership and general supervision over all public education, (2) serving as the general planning and coordinating body for all public education, (3) advising the Legislature regarding the financial requirements in connection with public education, and (4) appointing the superintendent and determining the term of office. The superintendent's responsi-

bilities are limited to serving as the executive arm of the board and the Department of Education.

Const 1963, art 8, § 3 does provide that the Department of Education "shall have powers and duties provided by law." The Legislature, and in some circumstances the Governor, is afforded some authority over the Department of Education through this language.[7] However, that authority may not be used in a manner that undercuts the constitutionally mandated relationship between the board and superintendent. See OAG, 1965-1966, No 4530, pp 300, 307 (June 1, 1966) (The Legislature is "without power to prescribe the qualifications for the office of superintendent" because that power is specifically given to the board under art 8, § 3).

In sum, the language of the 1963 Constitution, and circumstances surrounding its adoption, evidence an intention to establish an hierarchical relationship between the board and the superintendent. The superintendent, as the executive arm of the board, derives authority from the board, and not from an independent source such as the Governor or the Legislature.

IV. APPLICATION OF THESE PRINCIPLES
TO THE PROPOSED REORGANIZATION

As explained above, the power of leadership and general supervision vested in the Board of Education necessarily requires that the board also serve as the head of the Department of Education. Executive

---

[7] Thus, the board, as head of the Department of Education, may have some "duties provided by law." These duties are not given to the board directly, but are given to the Department of Education. The board then executes the duties as the head of that department.

Order 1996-11 effectively undermines the board's position as the head of the Department of Education. First, it rescinds Executive Order 1965-9, which established the board as the head of the Department of Education. And, second, it transfers all "administrative statutory powers, duties, functions and responsibilities" from the board to the superintendent. Under the order, the only connection the board has to the Department of Education is through the power to appoint the superintendent.

I agree with the dissent in the Court of Appeals that Executive Order 1996-11 "would essentially eliminate the transfer of power voted on by the people when they voted for the 1963 constitution and would render the transfer meaningless." 230 Mich App 255. Thus, I would find Executive Order 1996-11 to be unconstitutional on its face.

Similarly, the attempted transfer of specific statutory functions from the board to the superintendent within Executive Order 1996-12 is in violation of the hierarchical relationship established between the board and the superintendent in art 8, § 3. The superintendent, as the executive arm of the board, derives authority from the board. The superintendent's executive duties within the Department of Education are also subject to the oversight and authority of the board as the head of that department. Thus, the Legislature may proscribe functions for the Department of Education to carry out, but it may not specifically vest the authority over those functions in the superintendent. Likewise, the Governor may not shift those legislatively proscribed functions from the board to the superintendent. Rather, it is for the board to determine which legislatively proscribed functions to

delegate to the superintendent as its executive arm.
Therefore, I would also find Executive Order 1996-12
unconstitutional on its face.

KELLY, J., concurred with CAVANAGH, J.